A. J. C. McCALLUM, Respondent,

v.

**EXECUTIVE AIRCRAFT COMPANY, a**
corporation, Appellant.

No. 22362.

Kansas City Court of Appeals.

Missouri.

June 4, 1956.

James H. Ottman, Kansas City, Alan F. Wherritt, Wherritt & Turpin, Liberty (Sebree, Shook, Hardy & Ottman, Kansas City, of counsel), for appellant.

George H. Charno, Jr., Charno & Charno, Kansas City, Judson L. Palmer, Palmer & Davidson, North Kansas City, for respondent.

CAVE, Judge.

This is an action to recover damages to an airplane owned by respondent-plaintiff. Trial to a jury resulted in a verdict and judgment in favor of the plaintiff for $6,-000, and defendant appealed.

The cause was submitted to the jury on the theory that the defendant, at plaintiff's request, sent its employee to inspect and repair the propeller of plaintiff's plane; that said agent performed work on the same and released the plane for flight, representing to plaintiff that the propeller was airworthy and safe for flight; that plaintiff relied upon said representation and undertook to fly the plane; that immediately after taking off from the airport, the propeller malfunctioned by failing to maintain the necessary power and was not airworthy and safe for flight; and that as a result thereof plaintiff was required to make a forced landing, and thereby damaged the plane.

A general statement of the facts will first be made. Plaintiff, a physician and surgeon of Aurora, Missouri, was a licensed pilot and the owner of a Cessna 195 Aircraft. His flying experience included approximately 570 hours, of which about 100 hours were night flying. On February 21, 1954, he had flown his plane from Springfield to Warrensburg, Missouri, without difficulty. Later, when he started the engine for the purpose of warming it up for the return trip, the propeller suddenly started losing oil and threw out 14 quarts in 45 seconds. Plaintiff called defendant and asked that a qualified repairman be sent to make the necessary repairs. Defendant is a corporation and is certified as a *Repair Station for Aircraft* by the Civil Aeronautics Authority (hereafter referred to as CAA). Plaintiff had requested that defendant send a CAA licensed Airframe and Engine Mechanic, known as an "A. & E.", to repair the plane. Defendant sent Lloyd Oliver, an employee, who did certain work on the propeller and represented to plaintiff that the "propeller was O.K. * * * was in A–1 mechanical condition. * * * I assured Dr. McCallum that it was all right. * * * That it was safe for that flight." Shortly thereafter, plaintiff started the engine, adjusted the controls, and the propeller attained 2100 revolutions per minute (hereafter referred to as rpm), and the plane became airborne. But when it attained an altitude of about 400 feet, the rpm suddenly reduced to a range between 1200 and 1400, which was not safe for flight, and plaintiff made an emergency landing, damaging the plane.

Defendant does not contend that the evidence is insufficient to establish a warranty, but asserts that: "The plaintiff failed to prove or to sustain the burden of proving that the alleged improper 'examination, inspection and repair' of plaintiff's propeller was the proximate cause of the 'forced landing' made by plaintiff and the resulting damage to his plane." This requires a more detailed statement of the evidence.

It is conceded that Oliver was defendant's employee; that he was sent to inspect and repair plaintiff's plane; that he was authorized, on behalf of defendant, "to release said aircraft for flight and airworthiness respecting the aircraft propeller only, after effecting repairs and replacements of same"; that Oliver did inspect and make certain repairs of the propeller; that he released the aircraft for flight and stated and represented to the plaintiff that the propeller was in good mechanical condition and airworthy. Plaintiff testified that he relied on such representations, otherwise he would not have attempted the flight.

The evidence respecting the repairs to the propeller is conflicting as to the appropriateness of the procedures employed by Oliver and the efficacy of his work. Under the theory of liability submitted in plaintiff's Instruction No. 1, we think it is unnecessary to detail this conflicting evidence. Suffice it to say that plaintiff produced expert testimony to the effect that Oliver had not, in all respects, used approved methods in inspecting the propeller and repairing and reassembling the same. The case was submitted to the jury on the theory of breach of warranty, and not on negligence. The propriety of the submission for breach of warranty will be discussed later.

Defendant's specific contention under its Point One is that, even if it be conceded that plaintiff's evidence did establish that defendant's agent improperly inspected or repaired the propeller and represented to plaintiff that the propeller was airworthy, and that thereafter in the course of plaintiff's take-off from the airport the propeller malfunctioned in certain respects, nevertheless plaintiff's evidence fails to establish that such malfunction was the proximate cause of the plane crash. This contention is based on the following facts: that this type of airplane has but one propeller; that in the cockpit are two controls, one for governing the power of the engine and the other controls the revolutions of the propeller; that the throttle controlling engine power registers on an instrument referred to as a manifold pressure gauge calibrated in inches of mercury; that the revolutions of the propeller are controlled by a propeller control and the rpm registered on an instrument referred to as a

tachometer. So far as the issues in this case are concerned, the above respective controls are independent of each other; that is, the rpm of the propeller are not changed by adjusting anything but the propeller control and are unaffected by minor changes in the engine throttle setting. There is considerable technical evidence concerning the operation of the engine power and the propeller rpm, but it is unnecessary to detail such evidence because there appears to be no conflict on that feature of this type of plane.

The maximum propeller power of this plane was 2300 rpm. After plaintiff had been assured by defendant's agent that the plane was airworthy, he warmed up the engine and set its power at "29 inches", and set the propeller control at full speed and the propeller attained 2100 rpm during the take-off. When plaintiff attained an altitude of approximately 400 feet, and while in the process of making a left turn, he reduced the engine throttle or manifold pressure from 29 inches to 23 inches, which should not affect the propeller rpm, but the propeller rpm immediately dropped to 1200–1400, which was insufficient to keep the plane safely airborne. Plaintiff testified that he did not touch or change the propeller control.

There was testimony by experts that the sudden reduction in rpm, under the circumstances above mentioned, indicated a propeller failure, and that a plane of this type could not be kept safely airborne with only 1200–1400 rpm.

However, defendant argues that the proximate cause of the damage to the plane was what plaintiff did and failed to do after the malfunctioning of the propeller; that is, the manner in which plaintiff piloted the plane after the emergency arose. Plaintiff testified that he first intended to make a 360° turn and land in the same direction in which he had taken off from the airport, although that is difficult at an altitude of 400 feet; but after he started the turn, a passenger in the plane stated that he thought the engine might be on fire, and with this additional hazard, the plaintiff did not increase the manifold pressure, which would increase the fire hazard, but attempted to and did make a 180° turn and approached the field for landing. The landing gear touched the runway near the off-end, blew out a tire, and the plane catapulted into a wire fence, continued across a state highway and turned over in a nearby field.

Plaintiff admitted that he was aware of the usual procedure, when a single engine plane cannot maintain its altitude, that the pilot should undertake to land "straight ahead" and on the most favorable terrain, and especially is this true when the plane is at a low altitude. However, he stated that this accident occurred about 9 p. m. on a dark February night; that he had been advised that there was a lake in the immediate vicinity, but did not know its location; that he was not familiar with and could not see the condition of the surrounding fields; and under such circumstances he thought it best to attempt to reach the airport which was nearby. He also admitted he did not attempt to increase the engine power because "I was afraid to attempt to climb and give the engine any power, because if it failed, we would merely stall out and both be killed".

Witness Haus, an experienced pilot who holds the highest rating issued by CAA, testified in substance that when a power failure occurs in a single engine craft on take-off, the usual procedure is to land "straight ahead if conditions permit"; that the pilot should look immediately for a place to land and effect a landing as soon as possible; that a power failure at night is extremely hazardous; "Its a groping affair at night and your chances are greatly reduced"; that in case of a partial failure of power, he stated, "If I had enough power that I thought, and I was in a position to get to a field, I would certainly try to do so"; that it is better to land downwind than attempt to increase power and rely on a malfunctioning propeller which may malfunction again in a worse position where the field cannot be reached without power.

■ Defendant argues that plaintiff failed and neglected to increase the manifold pressure with the expectation of increasing

the rpm and did not attempt to make a 360° turn and land on the airport in the same direction he had taken off; and that such failures left the question of the proximate cause of the emergency landing to speculation, conjecture and surmise. It is also argued that the real reason plaintiff did not make such attempts was because the passenger stated the engine was on fire.

This argument boils down to the question of whether the plaintiff so piloted the plane after the malfunctioning of the propeller that it can be said as a matter of law that the proximate cause of the forced landing was due to such conduct and was not due to the failure of the propeller. In support of its argument, defendant cites Worley v. Procter & Gamble Mfg. Co., 241 Mo.App. 1114, 253 S.W.2d 532; Kane v. Chicago, B. & Q. R. Co., Mo., 271 S.W.2d 518, and Springer v. Security National Bank Savings & Trust Co., Mo., 175 S.W.2d 797. The opinion in the Worley case is inapplicable because the plaintiff failed to show that the product manufactured by the defendant contained any ingredient or chemical compound injurious to the skin of persons using it. In the instant case, the evidence does establish a breach of warranty that the propeller was safe and airworthy. The other two cases cited by defendant announce the general rule that if the evidence merely establishes that the injury might have resulted from several causes, for some but not all of which defendant was liable, the necessary causal connection remains in the realm of conjecture and speculation. We do not believe that general rule is applicable in this case.

In Louisville & N. R. Co. v. Beatrice Foods Co., Mo.App., 250 S.W.2d 825, 828, it is said : "* * * if the initial act or omission is one from which harm is the natural, probable and foreseeable consequence then he who performs the original act or makes the original omission is liable, notwithstanding the fact that other causes, conditions or agencies intervene between his negligence and the ultimate result. * * * 'The doctrine of proximate cause is well enough defined in the body of our law; it is only the application of it to a given state of facts which often proves

of difficulty. As a general proposition, the proximate cause of a given result is said to be the cause which, in a natural and continuous sequence, unbroken by any new and independent or efficient, intervening cause, produced the result complained of, and without which the same would not have occurred. It satisfies the requirements of proximate cause that the negligence for which recovery is sought was the efficient force which set in motion the chain of circumstances leading up to the injury itself; and the primary cause will be the proximate cause, notwithstanding the presence in the case of such chain of circumstances, where it is so linked and bound to the succeeding events that they all create or become a continuous whole, the first so operating upon those that follow as to make it primarily productive of the injury.' "

■ It was foreseeable by the defendant that plaintiff would fly the plane relying upon the representation that the propeller had been properly inspected and repaired and was airworthy. Since there is evidence that the propeller was not safe as represented, its malfunction placed plaintiff in an emergency situation necessitating a landing as soon as possible. He was confronted with an emergency, not of his own making, requiring immediate action under excitement and peril. All of these factors are to be considered in ruling on his conduct. Where an emergency exists requiring sudden action, one is not necessarily negligent in failing to exercise what, after calm deliberation, appears to be the better judgment. Doyel v. Thompson, 357 Mo. 963, 211 S.W. 2d 704, 709. Under the facts, it cannot be said, as a matter of law, that plaintiff's actions in landing the plane were the proximate cause of the damage.

■ We think the evidence is sufficient to make a submissible issue of whether the breach of warranty was the proximate cause of the damage to the plane. That issue was submitted by plaintiff's instruction No. 1 and defendant's counter-instruction No. 7.

Defendant's next contention is that the court erred in giving plaintiff's instruction No. 1. The instruction covers the entire

case and directs a verdict for plaintiff. It submits the case on the theory of breach of warranty as heretofore outlined. Defendant's first criticism is that the petition alleges *only* a cause of action for *negligently* failing to properly examine, inspect and repair the plane; consequently, the instruction submitted an issue not pleaded.

The petition is in one count and certainly alleges a cause of action for negligence. But we must determine whether it also alleges a breach of warranty. In substance, it is alleged that plaintiff was the owner of the plane in question; that the defendant was engaged in the business of dealing in Cessna Aircraft and in the maintenance, repair and servicing thereof, and employed mechanics to perform such services; that plaintiff started the engine of his plane and immediately large quantities of oil leaked from the propeller; that he called defendant and requested that defendant make an inspection of said plane and effect all necessary repairs; that defendant sent its agent and employee to perform such services; that by Civil Air Regulations, part 18, the defendant and its employee were required by law to perform inspection and repair of said plane so as to make it airworthy; that plaintiff had no control or supervision over the examination, inspection or repairs effected by defendant's employee; that plaintiff relied upon defendant's employee for proper examination, inspection and repair of said propeller and engine; that after such inspection and repairs, the defendant, its agent, servant and employee, "warranted that said aircraft was airworthy"; that after such inspection and repairs the plaintiff properly started the engine and propeller and became airborne, but when the plane had reached an altitude of approximately 400 feet, the power of the propeller failed and plaintiff was required to make a forced landing, by which the plane was damaged.

■ It may be conceded that the petition is not a classic example of the pleader's art, but there was no attack made upon it prior to judgment or a motion to require the plaintiff to elect. Under such circumstances, every reasonable intendment must be indulged in favor of the pleading and the petition should be construed most favorably to the plaintiff. Emerson v. Treadway, Mo.App., 270 S.W.2d 614, 621.

■ A party may join in one count a cause of action for negligence and for breach of warranty and, if the evidence is sufficient, may submit either. Bell v. S. S. Kresge Co., Mo.App., 129 S.W.2d 932, 935; Kearns v. Sparks, Mo.App., 260 S.W.2d 353; Emerson v. Treadway, supra; Dalton v. St. Louis, I. M. & S. Ry. Co., 187 Mo. App. 691, 173 S.W. 77; Sec. 509.110, V.A. M.S.

We take note that at the outset of the trial, plaintiff's counsel stated that defendant's warranty was the basis of his cause of action; that all of the evidence in support of a warranty and a breach thereof was received without objection; that in answer to interrogatories submitted prior to trial, the defendant admitted that Oliver was "employed by defendant as an aircraft propeller repairman"; that it sent him to repair plaintiff's propeller, and that he was "authorized by defendant to release said aircraft for flight and airworthiness respecting the aircraft propeller only, after effecting repairs and replacements of same"; and that defendant was a licensed Repair Station. Oliver testified that *only* a properly "certified Repair Station could perform the repairs to a propeller". We mention these facts to indicate that the parties and the trial court proceeded on the theory that a cause of action for breach of warranty was pleaded.

■ The petition, not having been attacked by motion in the pleading stage, and there being no objection to the evidence that a warranty was made and breached, it is too late to attack the sufficiency of the petition after judgment. Kearns v. Sparks, supra; and Witte v. Cooke Tractor Company, Mo.App., 261 S.W.2d 651. The instruction is not erroneous on the theory that it submitted an issue not pleaded.

■ Defendant next contends that the instruction is erroneous because it fails to hypothesize certain essential elements of

plaintiff's right to recover. It is the established law that an instruction which purports to cover the entire case and direct a verdict must hypothesize every fact essential to plaintiff's right of recovery, and a failure to do so constitutes reversible error. Walton v. A. B. C. Fireproof Warehouse Co., 233 Mo.App. 693, 124 S.W.2d 584, 589; Reese v. Illinois Terminal R. Co., Mo., 273 S.W.2d 217, 223. Under this point, defendant argues that the instruction does not require the jury to find that defendant's employee was authorized to make the representation as to airworthiness of the plane. There is no merit in this contention. The defendant, in answer to interrogatories submitted, stated that its employee was authorized "to release said aircraft for flight and airworthiness respecting the aircraft propeller * * *". This was a judicial admission of fact. It is not error for an instruction to assume a fact established by undisputed evidence and concerning which there is no real issue. St. Vincent's Sanitarium v. Murphy, Mo.App., 209 S.W.2d 560, 566; Adams v. State Automobile Ins. Ass'n, Mo.App., 265 S.W.2d 738, 741.

Defendant next argues that the instruction is erroneous because it fails to require the jury to find that the malfunction of the propeller was the result of some act or omission or failure on the part of defendant's employee. This raises a serious question, and if the case had been submitted on the theory of negligence, the instruction should have hypothesized the facts relative to the acts of negligence. The cases cited by defendant so hold. But the case was not submitted on negligence.

The instruction requires the jury to find that the defendant sent its employee "to inspect and repair the propeller on plaintiff's aircraft"; that the employee "performed work on the propeller, * * * and thereafter released said aircraft for flight representing to plaintiff that the propeller * * * was airworthy and safe for flight, * * * that plaintiff relied upon said representations, * * * and shortly after said take-off, that the propeller malfunctioned by failing to maintain the power for

which plaintiff had set same with the propeller control * * * in that the propeller lost power to a range of approximately 1200 to 1400 revolutions per minute while the cockpit control was set for maximum propeller power of approximately 2100 to 2300 revolutions per minute * * *; and if you further find * * * that said aircraft propeller was not in fact airworthy and safe for flight and that as a direct and proximate result thereof plaintiff was required to make a forced landing * * *;" and as a result the plane was damaged, then the verdict should be for the plaintiff.

The instruction does not require the jury to find that the defendant's agent committed some act or omission which was the proximate cause of the propeller to malfunction. We do not believe it was necessary to hypothesize such acts or omissions. The basis of plaintiff's cause of action is an express warranty or representation that the propeller had been properly inspected and repaired and would properly function in flight. This was a specific, unqualified and absolute representation of an existing fact, and was a warranty of that fact. Witte v. Cooke Tractor Company, supra. The warranty was breached when the propeller malfunctioned immediately after the take-off and while the control of the engine and the control of the propeller were set at the proper and accepted positions. The plaintiff did not know, and could not know, what caused the propeller to fail. He had a right to rely, and did rely, upon the representation of defendant's agent, who was an expert in the repair of airplane propellers. A very similar instruction to the present one was approved in Turner v. Central Hardware Co., 353 Mo. 1182, 186 S.W.2d 603, 609, 158 A.L.R. 1402. That case involved an express warranty of the soundness of a stepladder sold by defendant to plaintiff, which, when put in use, broke and plaintiff was injured. The questions of an express warranty and the breach thereof are elaborately discussed in that opinion and we need not restate them here.

In Haines v. Necce, 116 Mo.App. 499, 92 S.W. 919, 922, the suit was for breach of an

express warranty that certain furniture was "of first-class quality and make and was suitable for use in a first-class hotel, * * *". The principal instruction required the jury to so find, and also to find that such furniture was "not of the quality and kind contracted to be delivered, but were of an inferior kind and quality and not suitable for use in a first-class hotel, * * *". The instruction did not hypothesize any facts as to why the furniture was not suitable. The instruction was approved.

A warranty of work may exist if the parties so intend without the use of any particular words in the contract. 12 Am.Jur., Contracts, page 806. In Van Buskirk v. Murden, 22 Ill. 446, the court held that the defendant had warranted to do a good job of plastering and approved an instruction which required the jury to find that such warranty was made and "if they further believe, from the evidence, that the plastering done by the defendant fell off, this is a matter of consideration for the jury, and the jury may infer that the defendant did not do a good job, unless the defendant shows that the falling off of the plastering was occasioned by some cause not within the power of the defendant". In the instant case, the defendant warranted the sufficiency of its inspection and repair, and the fact that the propeller failed immediately after it is put to a test is sufficient for the jury to infer that the employee had failed to properly inspect and repair it. We hold that it was not necessary for the instruction to hypothesize facts wherein the employee failed to properly inspect or repair.

Defendant next contends that the instruction is erroneous because it fails to define the words "forced landing". The instruction requires the jury to find that the propeller was not in fact airworthy and safe for flight and that as a direct and proximate result thereof "plaintiff was required to make a *forced landing*; * * *". The words "forced landing" are of ordinary meaning and in no sense have a technical meaning. Webster's New Collegiate Dic-

tionary, Second Edition, defines "forced" as meaning "compelled by force or necessity; involuntary; compulsory; as * * * a *forced landing*". The same edition defines "landing" as "when made because of engine failure or bad weather it is called a *forced landing*". It was not necessary for the instruction to define "forced landing". However, if defendant felt the term required definition it should have offered an instruction for that purpose. Greaves v. Kansas City Junior Orpheum Co., 229 Mo. App. 663, 80 S.W.2d 228, 237; Henson v. Jasinksy, Mo., 251 S.W.2d 601, 603; and many other cases cited in 27 Missouri Digest, Trial, ☞255(13).

Defendant's last contention is that it was deprived of a fair trial because one of the jurors improperly failed to reveal her experience as to airplanes and flight training. Defendant raised this question in its motion for new trial. The record discloses that during the voir dire examination, counsel for defendant asked certain questions of the panel concerning their experience with airplanes and the flying thereof. The questions asked are as follows: "Q. Any of you gentlemen * * * on the panel ever been a pilot of a plane? Have any of you ever taken pilot training * * *? Have any of you ladies or gentlemen ever qualified as navigators, co-pilots, hostesses, stewardesses, all of the other things * * *? Have any of you folks ever been in a plane that had any difficulties, or did crash land, or have to land in an unscheduled manner?" Two or three of the panel answered that they had either been pilots or hostesses. A Mrs. Roland Middlekauff was a member of the panel and was selected as one of the jurors. She made no response when the above questions were asked.

In support of the motion for new trial, defendant produced Roland Middlekauff, the husband of juror Mrs. Middlekauff, and he testified that shortly after the first World War he flew a plane as a "barnstormer"; that about that time he and his wife were married, and on a few occasions she rode with him in the plane, but at no

time operated it or had any part therein; that he never gave her any lessons or instructions in flying the plane; that to his knowledge no one else had given her any such instructions; and that he had not flown a plane during the past 30 years and was not and had never been a licensed pilot. Mrs. Middlekauff testified to substantially the same facts. The most pertinent questions asked her were: "Q. Have you ever made any study of planes at all? A. I have not. Q. Have you ever received any instructions in flying? A. No. Q. Either from your husband or any one else? A. Not from anyone other than Mr. Middlekauff." After hearing the evidence, the court overruled the motion for new trial.

■■■ It is universally held that a party litigant is entitled to a trial by a jury composed of twelve fair, impartial and qualified persons. It is the duty of jurors on voir dire examination to answer questions fully, frankly and honestly. However, an unintentional failure to disclose information not directly connected with the case does not necessarily show prejudice on the part of the juror so as to call for the trial of the case anew. Tyler v. Kansas City Public Service Co., Mo.App. 256 S.W.2d 563.

■■■ In the instant case, the questions asked did not seek to elicit information directly connected with the case on trial or any connection with or relation to either party to the litigation. The information sought related to the panel's knowledge of and familiarity with the operation of airplanes generally, not the one involved in the present suit. As indicated above, the questions and answers relied on by defendant are: "Q. Have you ever received any instructions in flying? A. No. Q. Either from your husband or anyone else? A. Not from anyone other than Mr.

Middlekauff." The last answer appears to be inconsistent with the one immediately preceding. When all of her testimony is taken into consideration, we think the trial court could well have believed that she did not intend to say that she had received instructions in flying from her husband. This for the reason that she had been asked, "Have you flown at any time prior to the date you served as a juror in this case? A. No." But when it was explained to her that what was meant by the question was had she flown as a passenger, she then stated that she had flown with her husband a few times about 30 years before. She was then asked whether she had ever ridden in any private plane and stated that she had not, but on further questioning, said she had ridden in T. W. A. planes as a passenger a few times. Certainly, the trial court could have believed there was no intentional concealment, misrepresentation or deception and prejudice on the part of the juror. Barb v. Farmers Insurance Exchange, Mo., 281 S.W.2d 297. Furthermore, if Mrs. Middlekauff had ever received any instructions or directions from her husband about an airplane it had occurred 30 years before the trial and in a plane which would bear little, if any, resemblance to a modern plane. We do not believe the trial court abused its discretion in overruling this ground for new trial.

In support of its contention, defendant cites Bass v. Durand, 345 Mo. 870, 136 S.W.2d 988, and Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459. We have examined these cases and the facts are so foreign to the facts in the instant case that they cannot be considered controlling.

Finding no reversible error, the judgment should be affirmed. It is so ordered.

All concur.